1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

8

## SOUTHERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,                    CASE NO. 09CR2519-WQH

11                              Plaintiff,        ORDER
             vs.
12  RIGOBERTO RODRIGUEZ,

13                              Defendant.

14

15  HAYES, Judge:

16          The matters before the Court are 1) the Motion to Suppress Wiretap Evidence ECF No.

17  94 filed by Defendant Rigoberto Rodriguez and 2) the Motion to Suppress Evidence ECF No.

18  107 filed by Defendant Rigoberto Rodriguez.

19          The indictment in this case charges four defendants with the following two charges: 1)

20  conspiracy to distribute controlled substances in violation of 21 U.S.C.§ 841(a)(1) and 846;

21  and 2) possession with intent to distribute a controlled substance (September 25, 2008) in

22  violation of  21 U.S.C.§ 841(a)(1) and 18 U.S.C. § 2.

23  **1)  Motion to Suppress Wiretap Evidence ECF No. 94**

24  **Background Facts**

25          The charges in this case stem from an investigation that included eight separate wiretap

26  authorizations each for a thirty day period.  At no time during the investigation, did the

27  Government request the interception of any lines belonging to the Defendant.  All of the

28  interceptions of the Defendant occurred over the interception of line TT#5 belonging to co-

1  Defendant Carlos Urias De La Rocha.

2         The wiretap was initiated on December 5, 2007 on TT#1, the line belonging to co-

3  Defendant Cleofas Ortega-Villarreal.  Prior to any wiretap application, DEA agents used a

4  confidential informant to arrange  a sale of cocaine.  Defendant Carlos Urias De La Rocha was

5  introduced to the confidential informant as a kilogram distributor of cocaine prior to the wire

6  intercepts.  During the interception of TT#1, agents learned that Defendant Carlos Urias De

7  La Rocha was coordinating drug distribution and alien smuggling activities.

8         Through the affidavit in support of the sixth wiretap application, agents applied to

9  intercept TT#5, the cellular phone belonging to Defendant Carlos Urias De La Rocha.  In

10  Paragraph 15k. of the affidavit dated November 4, 2008, the affiant stated:

11         Rigoberto RODRIGUEZ, ("Rodriguez") is an individual who facilitates the
            Ortega-Villarreal DTO's importation activities.  Specifically, RODRIGUEZ
12         coordinates the importation of narcotics from the Republic of Mexico into the
            United States.  On numerous occasions, from August 30, 2008 to September 17,
13         2008, over Urias TT#5, URIAS and RODRIGUEZ discussed the construction
            and use of a load car with a secret compartment to be used to smuggle multi-
14         kilogram/pound quantities of narcotics.  On September 17, 2008, URIAS and
            RODRIGUEZ, over Urias TT#5, coordinated a meeting with an unidentified
15         male source-of-supply to acquire ten pounds of methamphetamine.  On
            September 25, 2008, pursuant to intercepts over Urias TT#5, investigating
16         agents seized ten pounds of methamphetamine from RODRIGUEZ's residence
            in Colton, California.  RODRIGUEZ resides at 1030 Oak Leaf Drive in Colton,
17         California.

18  ECF No. 103-6 at 12.

19         In paragraph 42g. of the same affidavit in support of the sixth wiretap application dated

20  November 4, 2008, the affiant described the September 25, 2008 seizure as follows:

21         On September 25, 2008, pursuant to intercepts over Urias TT#5, agents learned
            that URIAS was still in possession of the aforementioned ten pounds of
22         methamphetamine while at Rodriguez' residence in Colton, California.  Based
            upon the information, agents conducted a consensual contact with the occupants
23         of Rodriguez' residence; RODRIGUEZ, RODRIGUEZ's wife and URIAS.
            After obtaining consent to search, agents discovered ten pounds of
24         methamphetamine in a vehicle parked upon the residence's driveway.  Upon
            discovery of the aforementioned methamphetamine  URIAS denied knowledge
25         of the methamphetamine stating that he only borrowed the vehicle from his
            mother-in-law [ORTEGA-VILLARREAL].

26
    ECF No. 103-6 at 27.
27
    **Standing**
28
           Defendant has no standing to challenge any wiretap conversation to which he was not

a party.  "A defendant may move to suppress the fruits of a wiretap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises."  *United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973).

**Contentions of the Parties**

Defendant moves to suppress "all evidence obtained as a result of the interception of the Defendant's communications ... and any evidence derived therefrom."  ECF No. 94 at 7. Defendant asserts that the wiretap conversations in which he was a participant should be suppressed on the grounds that the affidavit stating probable cause falsely and repeatedly stated that investigating agents seized ten pounds of methamphetamine from the Defendant's residence on September 25, 2008. ECF No. 94 at 2-3.  Defendant contends that the agents knew that the narcotics were seized from a vehicle parked in the Defendant's driveway which the agents knew was in the exclusive control of co-defendant Carlos Urias De La Rocha. Defendant asserts that the agents knew that no methamphetamine was seized from his residence or any location over which he had dominion and control.  Defendant contends that the agents misled the court by an inference that methamphetamine was seized from his residence.  Defendant further asserts that there was no legal necessity for intercepting his telephone conversations.  Defendant asserts that the affidavit in support of the wiretap application demonstrated on its face that most of the traditional methods of investigation had been working.

The Government asserts that the statement in Paragraph 15k. of the affidavit that methamphetamine was "seized from the Rodriguez residence in Colton, California" was not misleading because "methamphetamine was found on the premises of his residence." ECF No. 103 at 10.  The Government explains that more details of the seizure were provided in Paragraph 42g. of the same affidavit which describes the specific events of the seizure, including the specific facts that the methamphetamine was found in the car parked in the driveway of the residence pursuant to a consent search and that Carlos Urias De La Rocha stated that he borrowed the car from his mother-in-law.  The Government further asserts that

there was sufficient evidence of probable cause in this case to support the finding that co-defendant Carlos Urias De La Rocha was a drug distributor and to authorize the interception of the conversations of Carlos Urias De La Rocha.  The Government contends that the representation that agents seized methamphetamine from the Rodriguez residence in Paragraph 15k. was not material to the determination by the court that there was probable cause sufficient to intercept the communications of Carlos Urias De La Rocha over TT #5.

The Government further asserts that the Court did not abuse its discretion in finding necessity for the wiretap.  The Government asserts that the Defendant's challenge to necessity is "less than specific" and that the specific facts and circumstances in the affidavits rationally support the conclusion that normal investigative techniques were inadequate to identify and successfully prosecute the co-conspirators of Carlos Urias De La Rocha.  ECF No. 103 at 13.

**Material misrepresentation and Franks hearing**

The procedure to address claims of misrepresentations in an affidavit in support of a warrant was set forth by the United States Supreme Court in *Franks v. Delaware*, 438 U.S. 154 (1978).  The Supreme Court explained that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to a finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  *Id*. at 155-56.  The Supreme Court stated:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant.  To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.

*Id.* at 171.  In applying the standard set forth in *Franks v. Delaware*, the Ninth Circuit has identified five requirements that a defendant must meet to obtain an evidentiary hearing as follows: (1) the defendant must allege specifically which portions of the affidavit are allegedly

false; (2) the defendant must assert that the false statements or omissions were made deliberately or recklessly; (3) the defendant must present a detailed offer of proof, including affidavits, to support these allegations; (4) the offer of proof must challenge only the veracity of the affiant; and (5) the challenged statements must be necessary to the finding of probable cause. *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983); *see also United States v. Dicesare*, 765 F.2d 890, 894-95 (9th Cir. 1985). If the challenged statements are not necessary to find probable cause, the defendant is not entitled to an evidentiary hearing. *See United States v. Fowlie*, 24 F.3d 1059, 1067 (9th Cir. 1994).

In this case, the asserted misrepresentation first appears in the affidavit in support of the sixth wiretap application dated November 4, 2008 to intercept a number of lines, including TT#5 used by Carlos Urias De La Rocha. ECF No. 103-6. The affiant states at in Paragraph 15k. on page 13 that "[o]n September 25, 2008, pursuant to intercepts over Urias TT#5, investigating agents seized ten pounds of methamphetamine from RODRIGUEZ's residence in Colton, California." ECF No. 103-6 at 13. In Paragraph 42g. on page 27 of the same affidavit, the affiant describes the September 25, 2008 seizure in more detail and states:

> On September 25, 2008, pursuant to intercepts over Urias TT#5, agents learned that URIAS was still in possession of the aforementioned ten pounds of methamphetamine while at Rodriguez' residence in Colton, California. Based upon the information, agents conducted a consensual contact with the occupants of Rodriguez' residence; RODRIGUEZ, RODRIGUEZ's wife and URIAS. After obtaining consent to search, agents discovered ten pounds of methamphetamine in a vehicle parked upon the residence's driveway. Upon discovery of the aforementioned methamphetamine URIAS denied knowledge of the methamphetamine stating that he only borrowed the vehicle from his mother-in-law [ORTEGA-VILLARREAL].

ECF No. 103-6 at 27. This Court concludes that the affidavit did not misinform or mislead the court issuing the warrant. The detailed description of the seizure of the methamphetamine from a vehicle parked in the driveway of the Rodriguez residence is contained in the same affidavit as the alleged misleading statement. The Court was accurately informed of the material facts relating to the seizure of the methamphetamine at the Defendant's residence.

**Probable cause**

In order to justify a search, a search warrant affidavit must establish "a reasonable nexus between the activities supporting probable cause and the locations to be searched." *United*

*States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991).  Probable cause exists when, considering the totality of the circumstances, "'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Id. quoting Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).  "It is well-settled that the determination of probable cause is based upon the totality of the circumstances known to the officers at the time of the search."  *United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003) (citations omitted).  The decision is made by the magistrate on the basis of practical, common-sense considerations and overturned only if lacking a substantial basis.  *Illinois v. Gates*, 462 U.S. at 238.

The Court concludes that the facts in the affidavit were more than sufficient to state probable cause to believe that Carlos Urias De La Rocha was engaged in distribution of methamphetamine and to support the interception of his calls over TT#5 prior to the events of September 25, 2008.

**Necessity under Section 2518(1)(c) and Section 2518(3)(c)**

Wiretap authorizations are governed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522.  Section 2518(3)(c) of the Act provides in relevant part that a judge may approve a wiretap if he or she "determines on the basis of the facts submitted by the applicant that ... normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous...."  18 U.S.C. § 2518(3)(c).

In order to obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity.  *United States v. Rivera*, 527 F.3d 891, 897 (9th Cir. 2008); *United States v. Blackmon*,  273 F.3d 1204, 1207 (9th Cir. 2001).  Section 2518(1)(c) provides that the affiant in support of an application for a wiretap must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  The purpose of this requirement is to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974).

The review of the court "includes an assessment of whether the affidavit attests that

adequate investigative tactics were exhausted before the wiretap order was sought or that such methods reasonably appeared unlikely to succeed or too dangerous." *United States v. Gonzales*, 412 F.3d 1102, 1111 (9th Cir. 2005). Beyond the specificity requirement, the Court of Appeals has adopted a "common sense approach" in which the reviewing court uses a standard of reasonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to do so because of danger or low probability of success. *Blackmon*, 273 F.3d at 1207. In *United States v. McGuire*, 307 F.3d 1192 (9th Cir. 2002), the Court of Appeals stated that "conspiracies pose a greater threat to society than individual actions toward the same end" when considering the statutory requirement of necessity under Section 2518(1)(c). *Id.* at 1197. The Court of Appeals explained:

> Conspiracies pose other special dangers. Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. . . . Reflecting this concern, we have consistently upheld findings of necessity where the traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators. Because the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses, we conclude that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy.

*Id.* at 1197-98. (quotations and citation omitted).

The affidavit of Agent Coast in the record of this case describes in detail the investigation into drug distribution and violent acts of the co-conspirators. The agent includes case-specific detail of the investigation including undercover operations, confidential sources, physical surveillance, search warrants, electronic tracking devices, stationary video surveillance cameras, interviews, grand jury subpoenas, and immunity. ECF No. 108-6 at 32-49. The agent described the impediments of normal investigative procedures to determining the identity and location of various suppliers of the controlled substances, and the identity of a corrupt border patrol agent involved in the conspiracy. The agent explained the difficulties in locating the residences of the participants of the conspiracy within and outside the Southern District of California presented by traditional forms of investigation, for example, the agent described the unwillingness of participants in the conspiracy to respond to undercover operations or to work with non-family members; the limits of surveillance upon conspirators

living in Tijuana; and the limited information that can be obtained through subpoenas.
ECF No. 103-6 at 32 - 46.  The Court concludes that the facts stated in the affidavit in support
of the sixth application for wiretap adequately met the statutory requirement to show that
traditional investigative techniques had been exhausted and were unlikely to succeed and too
dangerous.

The Motion to Suppress Wiretap Evidence ECF No. 94 filed by Defendant Rigoberto
Rodriguez  is denied.

**2)  Motion to Suppress Evidence from Search ECF No. 107**

Defendant moves to suppress evidence, including the methamphetamine, seized from
the September 25, 2008 search of his home, property, cars and curtilage at 1030 Oak Leaf
Drive, Colton, California.  Defendant asserts that his consent to search and wife's consent to
search were "coerced  and involuntary."  ECF No.  107 at 2.  Defendant contends that the
officers approached his residence and "indicated that they wanted to search his home and that
if he did not agree they would get a warrant or court order to do so."  *Id*.

The Government asserts that the Defendant has no standing to challenge the search of
the vehicle in the driveway where the methamphetamine was found or the voluntariness of the
consent to search the vehicle given by Carlos Urias De La Rocha.  The Government further
asserts that the Defendant's driveway does not constitute curtilage and is not protected under
the Fourth Amendment.

Subject to limited established exceptions, the Fourth Amendment prohibits warrantless
searches of an individual's home or possessions.  *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110
S.Ct. 2797 (1990).  Consent to search is one of these exceptions.  *Schneckloth v. Bustamonte*,
412 U.S. 218, 219, 93 S.Ct. 2041, 2043 (1973).  "An individual may waive his Fourth
Amendment rights by giving voluntary and intelligent consent to a warrantless search of his
person, property, or premises."  *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir.
1996).  Consent to search is valid if voluntarily given.  *Schneckloth,* 412 U.S. at 248.

In this case, two officers initially approached the Defendant's residence while
Defendant was standing in his front yard.  The officers were conducting a "knock and talk"

based upon a call from an agent reporting that there were narcotics in a vehicle parked in the driveway of the residence. There was no obstruction of any kind between the Defendant and the approaching officers. Deputy Sheriff Carlos Robles was the first officer to contact the Defendant. Deputy Sheriff Robles was dressed in plain clothes, wearing a vest which clearly identified him as law enforcement, and a utility belt with a hand gun. Deputy Sheriff Robles asked whether the Defendant would allow the officers to search his residence. Defendant responded in a cordial manner to come in. Deputy Sheriff Cardenas then approached Deputy Sheriff Robles and the Defendant. Deputy Sheriff Cardenas was wearing an audio recorder. The remainder of the conversation was audio recorded, however, the initial exchange on the recording was garbled. Both Deputy Sheriff Robles and Deputy Sheriff Cardenas testified that the Defendant was cooperative and cordial at all times, that the Defendant never refused consent to search, and that the Defendant and his wife gave both oral and written consent prior to initiating any search.

The transcript of the audio recording made by the investigating officer during the search initially indicates that the Defendant stated: "You can't come in." ECF No. 113-1 at 4. Immediately after this statement, the Defendant Rodriguez repeatedly gave the officers consent to enter and search his house. (Rodriguez: "No, you can come in. You can check." ECF No. 113-1 at 5); (Rodriguez: "You're welcome to check the entire house." ECF No. 113-1 at 9); (Officer: "This is a paper that gives us permission to search the house. And you are saying that you give us permission, right?" Rodriguez: "Yes, sir. There's no problem." ECF No. 113-1 at 10); (Officer: "Your signature here indicates you give us permission to ...to search." Rodriguez: "You can search." ECF No. 113-1 at 11.); and (PERMISSION TO SEARCH, ECF No. 117-1 at 4).

The transcript of the audio recording shows that the Defendant's wife Yolanda Rodriguez gave consent to the officers to search the residence orally and in writing. (Officer: "Say, look, we are doing a narcotics investigation." Yolanda Rodriguez: "Yes." Officer: "This house may or may not be involved. Right?" Yolanda Rodriguez: "Uh-huh." Officer: "But we are asking permission. Your husband already gave it to us." Yolanda Rodriguez: "Yes."

Officer: "We are going to search the house with all due respect." Yolanda Rodriguez: "Yes." ...Officer: But I need you to give me permission." Yolanda Rodriguez: "No. Yes." ECF No. 113-1 at 16-17); (PERMISSION TO SEARCH, ECF No. 117-1 at 3).

The Court concludes that the Defendant did not refuse entry into the residence at any time and that the initial portion of the transcript is not accurate. There was no threat by the officers to get a warrant or mention of getting a warrant in the transcript prior to consent to search by Defendant Rodriguez and Yolanda Rodriguez. The record conclusively demonstrates that consent to search the residence by Defendant Rodriguez and Yolanda Rodriguez was voluntary and knowing and that there was no evidence seized from the residence.

After Defendant Rodriguez and Yolanda Rodriguez gave consent and signed a consent form to search the residence, the officers asked co-Defendant Carlos Urias De La Rocha for his permission to search the vehicle in the driveway. (Officer: We need your permission to search the car. URIAS "MM-hmm." Officer: We're not going to destroy it at all. Because it's not our property." URIAS: "Yes." Officer: But we're going to search it and make sure there's nothing illegal in the car. We have permission to search the whole house. You don't live here. You're visiting here, right? URIAS: "Yes.") ECF No. 113-1 at 20. The officers then gave co-Defendant Carlos Urias De La Rocha a form for written permission to search. (Officer: "If you want to read it, you're welcome to it, read it. You don't have to give us permission... But it's just to search the car. To make sure there's nothing illegal in there." URIAS "MM-hmm." ECF No. 113-1 at 22. Urias De La Rocha asked the officer "If I don't give you permission, what happens?" The officer responded: "I'll get an order, a search warrant from the magistrate and still, I will search it, That's no problem." (URIAS: "Oh! Okay, okay." Officer: Yes? Or I'll get a ,a, a, dog to sniff it and still it's the same. Do you see what I'm saying?" URIAS: "Oh Okay." Officer: "But I'm asking for your permission so that I don't have to go get that order, because we're going to get it anyway. We can get it." URIAS "MM-hmm.") ECF No. 113-1 at 23.

Carlos Urias De La Rocha gave permission to search and signed a PERMISSION TO

1    SEARCH form. ECF No. 117-1 at 2. The record conclusively demonstrated that Defendant

2    Rodriguez did not give consent to search the car belonging to co-Defendant Carlos Urias De

3    La Rocha which was parked in the Rodriguez driveway. The consent to search the car was

4    requested from and given by Carlos Urias De La Rocha, a co-defendant in this case and a

5    visitor in the house. Defendant Rodriguez does not have standing to challenge the consent

6    given by co-Defendant Carlos Urias De La Rocha.

7           Defendant Rodriguez asserts that consent given by URIAS was a "direct product" of

8    the warrantless, non-consensual entry into his house. The Court concludes that the entry into

9    the residence by the officers was consensual and legal, and that there are no grounds to

10   suppress the evidence found in the vehicle. The Motion to Suppress Evidence ECF No. 107

11   filed by Defendant Rigoberto Rodriguez is denied.

12          IT IS HEREBY ORDERED that 1) the Motion to Suppress Wiretap Evidence ECF No.

13   94 filed by Defendant Rigoberto Rodriguez is denied; and 2) the Motion to Suppress Evidence

14   ECF No. 107 filed by Defendant Rigoberto Rodriguez is denied.

15   DATED: June 29, 2011

16                                         _William Q. Hayes_
                                           **WILLIAM Q. HAYES**
17                                         United States District Judge

18

19

20

21

22

23

24

25

26

27

28